UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PEORIA PARTNERS, LLC, <br><br> Plaintiff, <br><br> v. <br><br> THE MILL GROUP, INC. and BADGER HOLDCO LTD., <br><br> Defendants. | Case No. 15 C 6680 <br><br> Judge John Robert Blakey |

## MEMORANDUM OPINION AND ORDER

This breach of contract action arises from a failed landlord-tenant relationship. Plaintiff Peoria Partners, LLC ("Peoria Partners") and Defendant The Mill Group, Inc. ("The Mill Group") (with certain performance guarantees from The Mill Group's parent company, Defendant Badger Holdco Ltd. ("Badger Holdco")) entered into an Office Lease, whereby Plaintiff agreed to renovate and lease commercial space to The Mill Group. The relationship fell apart within months. Plaintiff's renovation work fell behind schedule, with each side blaming the other. As a result, Plaintiff and The Mill Group both claim to have terminated the Office Lease for the other's material breach. Plaintiff filed its breach of contract suit [1] first, and Defendants followed with a breach of contract counterclaim [8]. Now before this Court is Plaintiff's motion for judgment on the pleadings [11] [13]. The motion is denied for the following reasons.

## I. Legal Standard

Under Rule 12(c), this Court may grant Plaintiff's motion for judgment on the pleadings only if "no material issue of fact remains to be resolved," and the moving party is entitled to judgment as a "matter of law." *National Fidelity Life Insurance Co. v. Karaganis*, 811 F.2d 357, 358 (7th Cir. 1987); *see also Adams v. City of Indianapolis*, 742 F.3d 720, 727-28 (7th Cir. 2014). This Court must draw all facts and inferences in the non-movant's favor, here, Defendants. *Lodholtz v. York Risk Services Group, Inc.*, 778 F.3d 635, 639 (7th Cir. 2015). In deciding a Rule 12(c) motion, this Court may consider the pleadings, documents attached to or critical to (and referred to within) the pleadings, and information subject to judicial notice. *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012).

## II. Facts

On December 12, 2014, Plaintiff Peoria Partners (also known as "Landlord" in the Office Lease) leased the building located at 310 North Peoria Street, Chicago, Illinois (the "Property") to Defendant The Mill Group (also known as "Tenant" in the Office Lease) pursuant to an agreement titled: "Office Lease." Contract ¶ 6; Counterclaim ¶ 5; *see generally* Office Lease, attached as Exhibit 1 to Complaint [1-1]. The Property previously had been used for industrial and residential purposes, and required renovation before The Mill Group could use it for commercial purposes. Counterclaim ¶ 2.

Each party agreed to renovate the Property. Plaintiff went first. Plaintiff, among other obligations, agreed to complete the 24 separate items of construction,

2

repair and refurbishment listed in Exhibit 1 to the Office Lease.  Complaint ¶ 8; Counterclaim ¶¶ 5, 7-8.  Plaintiff had to "substantially complete" its renovations and turnover the renovated Property to Defendants on or before the "Proposed Turnover Date," which was March 31, 2015.  Complaint ¶ 12; Counterclaim ¶¶ 5-6.  Once Plaintiff turned over the Property, then The Mill Group's own renovation obligations commenced.  Complaint ¶ 9; Counterclaim ¶ 10.  In connection with The Mill Group's obligations under the Office Lease, Plaintiff secured a "Limited Joinder and Guaranty" from The Mill Group's parent company, Defendant Badger Holdco, to guarantee "payment and performance of all the obligations of Tenant under Section 4.D of the foregoing Lease."  Complaint ¶ 11.

Relevant to the present dispute, the Office Lease contains three provisions governing The Mill Group's contractual rights if Plaintiff breached its renovation obligations.  Under Section 4.C of the Office Lease, The Mill Group's "sole remedy" for Plaintiff missing the Projected Turnover Date is a rent abatement, but only if Plaintiff, among other requirements, uses "commercially reasonable efforts to substantially complete, or cause to be substantially completed, the Landlord's Work as soon thereafter as reasonably practicable."  Section 4.C states in relevant part:

> lf the Landlord's Work is not substantially completed by the Projected Turnover Date for any reason, then Tenant shall be entitled to a Rent abatement of two (2) days for each one (1) day of delay, as Tenant's sole remedy for delay.  Landlord shall not be liable or responsible for any claims, damages, or liabilities in connection therewith or by reason thereof, and such failure shall not affect the validity of this Lease or otherwise affect the obligations of Tenant hereunder; provided, however, in such event, (i) Landlord shall use commercially reasonable efforts to substantially complete, or cause to be substantially

3

completed, the Landlord's Work as soon thereafter as reasonably practicable (which need not require overtime work) ....

Section 19 governs "Defaults and Remedies," and Section 19.I defines when a "Landlord Default" occurs. A Landlord Default includes when Plaintiff: (1) fails to perform any contractual obligation; and (2) further fails to cure such default within 20 days (or a longer period under certain circumstances not relevant to this analysis) after written notice from The Mill Group. Office Lease § 19.I, attached as Exhibit 1 to Complaint [1-1]. Upon the occurrence of a Landlord Default, The Mill Group may exercise "any and all remedies available to Tenant as expressly provided in this Lease or that would be available to Tenant at law or in equity." Office Lease § 19.I, attached as Exhibit 1 to Complaint [1-1]. Section 19.I states in relevant part:

> **Landlord Defaults.** The occurrence or existence of any one or more of the following shall constitute a "**Landlord Default**" under this Lease: (i) … (ii) Landlord fails to observe or perform any of the other covenants, conditions or provisions of this Lease and fails to cure such default within twenty (20) days after written notice thereof from Tenant to Landlord …. Upon any Landlord Default under this Lease, Tenant shall be entitled to exercise any and all remedies available to Tenant as expressly provided in this Lease or that would be available to Tenant at law or in equity, subject only to the limitations set forth in Section 24 and Section 29.P of this Lease.

Last, under Section 31 of the Office Lease, if there is a "material breach" by one party, then the other party may terminate the agreement after giving written notice of the material breach and waiting 30 days (or a longer period under certain circumstances not relevant to this analysis) for the breaching party to cure that breach. Section 31 states in relevant part:

> Notwithstanding the foregoing, in the event the Landlord shall be in material breach of its material obligations under this Lease, resulting

4

in Tenant lawfully terminating this Lease, the obligation to Tenant to maintain a Security Deposit shall cease; provided, however, prior to Tenant being entitled to terminate this Lease for any claimed material breach by Landlord, Tenant shall first serve upon Landlord written notice setting forth with specificity the claimed breach, and Landlord shall have a period of thirty (30) days to cure such breach ....

There is no dispute that the project fell behind schedule. The parties dispute, however, the reason for the delays. Defendants allege that Plaintiff misrepresented its ability to renovate the Property, and, following the signing of the Office Lease (and later the First Amendment to Office Lease), was deficient in its performance of renovation work at the Property. *See generally* Counterclaim ¶¶ 12-36. Plaintiff, in its Responses to Counterclaim ¶¶ 12-36, denies those allegations.

On March 14, 2015, Plaintiff emailed The Mill Group, requesting an extension of the Projected Turnover Date from March 31, 2015 to May 31, 2015. Counterclaim ¶ 19. The parties dispute what sparked the request. The Mill Group blames Plaintiff's deficient performance, while Plaintiff blames The Mill Group's delays in finalizing its design plans. *Compare* Counterclaim ¶ 19, *with* Response to Counterclaim ¶ 19.

On March 23, 2015, Plaintiff and The Mill Group executed the First Amendment to Office Lease. *See generally* First Amendment to Office Lease, attached as Exhibit 2 to Complaint [1-2]. Fulfilling Plaintiff's request, Section 2.1 of the First Amendment to Office Lease extended the Projected Turnover Date from March 31, 2015 to May 31, 2015. In Section 2.4, the parties acknowledged that "there are a number of items set out under the Landlords Works [sic] which Tenant has asked Landlord to revise or otherwise hold from completing until Tenant's

5

designs have been finalized," and they also agreed to "use best efforts to complete all work on a timely basis."

In the days preceding the extended Projected Turnover Date of May 31, 2015, the parties exchanged emails about Plaintiff's still outstanding renovation work. Counterclaim ¶ 33. The Mill Group noted 16 outstanding work items that were Plaintiff's sole responsibility. Counterclaim ¶ 33; *see also* 6/12/15 Letter at 4, attached as Exhibit 3 to Complaint [1-3].

In a five-page June 12, 2015 letter from The Mill Group to Plaintiff, The Mill Group (through counsel) wrote that it had decided to "cease going forward with this project" and considered the Office Lease terminated effective July 13, 2015—31 days later—based on Plaintiff's "material breach" of the agreement. 6/12/15 Letter at 1-2, 5, attached as Exhibit 3 to Complaint [1-3]. The Mill Group explained that Plaintiff had missed the extended Proposed Turnover Date of May 31, 2015, and, based on the slow pace and poor quality of Plaintiff's work over the past six months, The Mill Group doubted whether Plaintiff could ever complete its renovations to the Property, let alone in a timely fashion. 6/12/15 Letter at 1-5, attached as Exhibit 3 to Complaint [1-3]. The Mill Group emphasized that a "fundamental and critical provision" of the Office Lease was Plaintiff turning over the renovated Property on time. 6/12/15 Letter at 1, attached as Exhibit 3 to Complaint [1-3].

Defendants allege that, following The Mill Group's letter, "Plaintiff made no attempt to cure its material breaches of the Lease." Counterclaim ¶ 38. Defendants further allege that during the "30-day cure period, Plaintiff made no efforts

6

whatsoever to cure its material breaches of the Lease." Counterclaim ¶ 55. Plaintiff, by comparison, denies that it "materially breached any of the terms of the Lease or First Amendment," and further denies that The Mill Group provided Plaintiff with a 30-day cure period. Responses to Counterclaim ¶¶ 38, 55.

Ten days later, on June 22, 2015, Plaintiff (through counsel) sent a four-page "Notice of Tenant Default under Office Lease" to both Defendants. 6/22/15 Letter, attached as Exhibit 4 to Complaint [1-4]. Plaintiff informed Defendants that The Mill Group's letter "constitutes a clear and unambiguous repudiation of the Lease." 6/22/15 Letter at 2, attached as Exhibit 4 to Complaint [1-4]. Plaintiff informed Defendants that The Mill Group was now in default, and it had 30 days to cure the default pursuant to Section 19.A of the Office Lease; otherwise, Plaintiff would terminate the Office Lease. 6/22/15 Letter at 2-3, attached as Exhibit 4 to Complaint [1-4]. Plaintiff also warned that it would take legal action. 6/22/15 Letter at 3, attached as Exhibit 4 to Complaint [1-4].

Plaintiff alleges that The Mill Group never cured its default. Complaint ¶ 24. Plaintiff, accordingly, elected to terminate the Office Lease, presumably sometime in July 2015, after the 30-day cure period lapsed. Complaint ¶ 26.

The present lawsuit ensued on July 30, 2015. Plaintiff brought a breach of contract claim against Defendants. On August 21, 2015, Defendants filed a Counterclaim [8]. In their Counterclaim, Defendants brought breach of contract claims (Counts I and III); a constructive eviction claim (Count II); and a conversion

claim (Count IV). Plaintiff now moves for judgment on the pleadings [11] [13] on all claims.

**III.   Analysis**

Under Illinois law, which the parties agree applies here, the "material breach" of a contract provision justifies non-performance by the non-breaching party. *Elda Arnhold & Byzantio, LLC v. Ocean Atlantic Woodland Corp.*, 284 F.3d 693, 700 (7th Cir. 2002); *Arrow Master, Inc. v. Unique Forming Ltd.*, 12 F.3d 709, 714-15 (7th Cir. 1993). As a general right of all contracting parties, the material breach also empowers the non-breaching party to terminate the contract. *Equal Employment Opportunity Commission v. North Knox School Corp.*, 154 F.3d 744, 749 (7th Cir. 1998); *WSG Executive Air, Inc. v. Bill Bradley for President, Inc.*, No. 00-3174, 2001 WL 58835, at *3 (N.D. Ill. Jan. 18, 2001) (citing *North Knox School*). A breach is material when the provision breached is so important that the contract would not have been made without it. *Arrow Master*, 12 F.3d at 715; *Wolfram Partnership, Ltd. v. LaSalle National Bank*, 765 N.E.2d 1012, 1025 (Ill. App. Ct. 2001). Determining whether a breach is material is a fact intensive question that generally is not appropriate for resolution at summary judgment, let alone at the even earlier motion for judgment on the pleadings stage. *Wolfram Partnership*, 765 N.E.2d at 1025.

Here, Plaintiff sidesteps the fact intensive material breach question at this early stage of the proceedings. Plaintiff instead argues that even if it breached the Office Lease, The Mill Group had no authority to terminate the agreement because

8

it failed to comply with the agreement's notice and cure provisions. Therefore, according to Plaintiff, The Mill Group itself had breached the Office Lease. To award judgment for Plaintiff based on this argument, this Court must answer at least two questions in its favor:

1. Did The Mill Group comply with either one of the Office Lease's notice and cure provisions?

2. If The Mill Group failed to comply, do the Office Lease's notice and cure provisions supersede The Mill Group's common law right to terminate the Office Lease for Plaintiff's purported material breach of the agreement?

Neither question can be answered in Plaintiff's favor from the pleadings alone.

### A. Notice and Cure Provisions

The Office Lease contains two notice and cure provisions relevant here. First, under Section 19.I, there is a "Landlord Default" when Plaintiff: (1) fails to perform any contractual obligation; and (2) further fails to cure such default within 20 days after written notice from The Mill Group. Second, if there is a "material breach" by Plaintiff, Section 31 of the Office Lease allows The Mill Group to terminate the agreement after giving written notice of the breach to Plaintiff and allowing 30 days for Plaintiff to cure the breach.

Here, drawing all reasonable inferences in its favor, The Mill Group may have satisfied the notice and cure requirements of both Sections 19.I and 31 of the Office Lease. Consistent with those provisions, The Mill Group, in its June 12, 2015 letter, detailed Plaintiff's purported material breach of the Office Lease. Plaintiff had missed the extended Proposed Turnover Date of May 31, 2015, and, based on slow pace and poor quality of Plaintiff's work over the past six months, The Mill

Group doubted whether Plaintiff could ever complete its renovations to the Property, let alone in a timely fashion. 6/12/15 Letter at 1-5, attached as Exhibit 3 to Complaint [1-3]. To this point, Section 29.C of the Office Lease states: "Time is of the essence of this Lease and each and all of its provisions." Likewise, Section 2.4 of the First Amendment to Office Lease states that the parties shall "use best efforts to complete all work on a timely basis."

While The Mill Group did state its present intention to "cease going forward with this project," the termination date was set out 31 days, until July 13, 2015. 6/12/15 Letter at 1-2, 5, attached as Exhibit 3 to Complaint [1-3]. Thirty-one days is more than the minimum time allotted to Plaintiff to cure its purported breach under both Section 19.I (20 days) and Section 31 (30 days) of the Office Lease. Defendants allege, and Plaintiff denies, that Plaintiff made no effort to cure its purported material breach in the 30 days following The Mill Group's June 12, 2015 letter. Counterclaim ¶¶ 38, 55. Also in response, Plaintiff argues that The Mill Group repudiated the Office Lease on June 12, 2015, the day it sent the letter, so setting a termination date out 31 days later was a hollow gesture that did not actually afford Plaintiff any opportunity to cure its purported breach. The Mill Group, according to Plaintiff, had to wait until the cure period lapsed before it could deem the Office Lease terminated.

At bottom, the question for this Court to decide is whether The Mill Group could satisfy the Office Lease's notice and cure provisions by setting a future termination date beyond the minimum time afforded to Plaintiff to cure any breach.

The Court answered a similar question in *Prime Choice Services, Inc. v. Schneider Logistics Transloading & Distribution, Inc.*, No. 13-1435, 2015 WL 7015268, at *4-5 (E.D. Wis. Nov. 12, 2015) (applying Wisconsin law), and found that the question raised factual questions that could not be answered at summary judgment. The question here is premature as well.

In *Prime Choice Services*, plaintiff Prime Choice Services, Inc. ("Prime Choice Services") agreed to staff defendant Schneider Logistics Transloading and Distribution, Inc.'s ("Schneider") warehouses. *Id.* at *1. Their contract included a five-day notice and cure provision if either party defaulted on its obligations. *Id.* On August 27, 2013, Prime Choice Services wrote to Schneider, stating that Schneider had breached their contract by not paying invoices on-time. *Id.* at *2-3. Schneider responded three days later, on August 30, 2013, promising to pay all outstanding invoices that same day. *Id.* at *2. Schneider broke its promise, not paying that day or any other day. *Id.* at *2, 4. The next day, August 31, 2013 (or four days after the August 27, 2013 letter), Prime Choice Services pulled its staff from Schneider's warehouses. *Id.*

Prime Choice Services brought an ensuing breach of contract action against Schneider for not paying invoices on-time, and Schneider filed a counterclaim against Prime Choice Services for failing to comply with their contract's five-day notice and cure provision. *Id.* at *2. Schneider moved for summary judgment on its counterclaim for two reasons, and the Court denied the motion. *Id.* at *4-5. Like Plaintiff here, Schneider first argued that Prime Choice Services failed to provide

11

Schneider with the contractually required five-day notice and cure provision. *Id.* at *4. The Court rejected that argument, explaining that, even though Prime Choice Services had walked off the job on day four, Schneider nonetheless retained the right to cure its breach in five days. *Id.* Schneider did not do that, so it never cured its breach. *Id.* Likewise, here, the parties dispute whether Plaintiff cured its purported material breach within 30 days of The Mill Group's letter, *see* Counterclaim ¶¶ 38, 55, so The Mill Group may have been justified in terminating the Office Lease effective day 31 (July 13, 2015).

Schneider then argued, again like Plaintiff here, that Prime Choice Services had repudiated the contract by walking off the job before the five-day notice and cure period ended. *Id.* at *4-5. The Court rejected this argument too. *See id.* Citing the Wisconsin law principle that a material breach by one party excuses subsequent performance by the other, which is the same under Illinois law, *see Arrow Master*, 12 F.3d at 714-15, the Court distinguished Prime Choice Services' duty to perform from its right to terminate the contract. *Prime Choice Services*, 2015 WL 7015268, at *5. Even if Prime Choice Services had to wait five days before terminating the contract, Schneider's purported material breach nonetheless may have immediately excused Prime Choice Services from having to perform under the contract in the interim. *Id.* Prime Choice Services was not required to continue performance in the face of nonpayment. *Id.* Here, Defendants can invoke the same argument to defend against Plaintiff's anticipatory breach claim. Judgment for Plaintiff thus is premature.

Plaintiff's remaining arguments are unavailing at this point in the proceedings. Plaintiff blames The Mill Group for the renovation delays. For example, Plaintiff, citing Section 2.4 of the First Amendment to Office Lease, argues that The Mill Group asked Plaintiff to revise or delay completing many project items. Plaintiff further argues that the First Amendment to Office Lease made no reference to any delays by Plaintiff in its work performance. Even if true, these facts do not preclude the reasonable inference that Plaintiff nonetheless may have breached the Office Lease. *See* Counterclaim ¶¶ 12-36. Plaintiff's deficient work, for example, may have caused the revisions and delays. Plaintiff's work may have been deficient in other areas too. Defendants allege, moreover, that even after the First Amendment to Office Lease was signed, Plaintiff's work remained deficient in numerous areas that were its responsibility alone. Counterclaim ¶ 33; 6/12/15 Letter at 4, attached as Exhibit 3 to Complaint [1-3].

Plaintiff alternatively argues that Section 4.C is The Mill Group's "sole remedy" for Plaintiff missing the Projected Turnover Date due to its renovation delays. A rent abatement is a far milder remedy than terminating the Office Lease. But this contractual limitation on The Mill Group's remedy applies only if Plaintiff uses "commercially reasonable efforts to substantially complete, or cause to be substantially completed, the Landlord's Work as soon thereafter as reasonably practicable." Office Lease § 4.C, attached as Exhibit 1 to Complaint [1-1]. The parties dispute whether Plaintiff used commercially reasonable efforts to complete

its building work, *see, e.g.*, Counterclaim ¶¶ 33-35, 38, 44-45, so it is premature for this Court to conclude that Section 4.C applies.

B.     **Common Law Doctrine of Material Breach**

Even if The Mill Group failed to satisfy the Office Lease's notice and cure provisions, The Mill Group nonetheless may have retained its common law right to terminate the Office Lease due to Plaintiff's purported material breach. First, the Office Lease, by its terms, does not bar The Mill Group's common law right to terminate for a material breach, at least when the material breach also qualifies as a Landlord Default under Section 19.I. Under Section 19.I, The Mill Group's remedy when there is a Landlord Default is written in the disjunctive. The Mill Group may exercise "any and all remedies available to Tenant as expressly provided in this Lease *or* that would be available to Tenant at law or in equity." Office Lease § 19.I (emphasis added), attached as Exhibit 1 to Complaint [1-1]. Section 31, which is the termination provision in the Office Lease for material breaches, accordingly, is not the exclusive mechanism for The Mill Group to terminate the agreement when there is a Landlord Default.

Likewise, in *WSG Executive*, 2001 WL 58835, at *2-3, the Court interpreted similar non-exclusive language to mean that the notice and cure provision there did not supersede the parties' common law right to terminate for a material breach. The termination provision in *WSG Executive* stated that the contractual remedy for a breach "shall not be an exclusive remedy." *Id.* at *3.

14

Second, in the absence of Illinois case law on the issue, the prevailing approach in other jurisdictions (and at least one leading treatise) is that a non-breaching party need not comply with a contractual notice and cure provision when the material breach is incurable. *See, e.g., L.K. Comstock & Co., Inc. v. United Engineers & Constructors Inc.*, 880 F.2d 219, 231-32 (9th Cir. 1989) (applying Arizona law); *Olin Corp. v. Central Industries, Inc.*, 576 F.2d 642, 646-48 (5th Cir. 1978) (applying Mississippi law); *Annecca Inc. v. Lexent, Inc.*, 307 F. Supp. 2d 999, 1010 (N.D. Ill. 2004) (applying New York law); *In re Best Film & Video Corp.*, 46 B.R. 861, 874-75 (Bankr. E.D.N.Y. 1985) (applying New York law); *LJL Transportation, Inc. v. Pilot Air Freight Corp.*, 962 A.2d 639, 648-52 (Pa. 2009) (applying Pennsylvania law); *Larken, Inc. v. Larken Iowa City Ltd. Partnership*, 589 N.W.2d 700, 701-04 (Iowa 1998) (applying Iowa law); *Stacey v. Redford*, 226 S.W.3d 913, 918-19 (Mo. App. Ct. 2007) (applying Missouri law); *Leghorn v. Wieland*, 289 So.2d 745, 747-48 (Fla. App. Ct. 1974) (applying Florida law); *see also* 13 *Corbin on Contracts* § 68.9 (2015).[1]

Here, because there are other grounds sufficient to deny Plaintiff's motion, it is unnecessary for this Court to predict whether the Illinois Supreme Court would excuse The Mill Group's compliance with the Office Lease's contractual notice and

---

[1] By comparison, two cases suggested, but did not decide, that this exception may not be available under Wisconsin law. One case granted summary judgment, applying the notice and cure provision there strictly. *Process Research Corp. v. Hyprotech Ltd.*, No. 00-561, 2001 WL 34379470, at *5 (W.D. Wis. June 14, 2001). The other case, citing *Process Research*, posited that it was "not clear [under Wisconsin law that] a material breach necessarily relieves a party of its obligations to comply with a contract's notice and cure provision prior to termination." *Mor-Cor Packaging Products v. Innovative Packaging Corp.*, 328 F. Supp. 2d 857, 864 (N.D. Ill. 2004). Neither case conclusively resolved the issue or addressed the weight of the case law adopting a contrary approach.

15

cure provisions when faced with an incurable material breach by Plaintiff.  It is sufficient for this Court to note that The Mill Group may have had grounds to terminate the Office Lease even had it not complied with Sections 19.I and 31.

**IV.    Conclusion**

For all of these reasons, Plaintiff's motion for judgment on the pleadings [11] [13] is denied.

Dated: December 16, 2015

                                          Entered:

                                          United States District Judge